UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

KRISTY LANDRY,

     Plaintiff,

       v.

VICTORIA'S SECRET STORES, LLC and
LIMITED BRANDS, INC.,

     Defendant.

Civil Action No.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Kristy Landry ("Ms. Landry"), by and through undersigned

counsel, and complains against the Defendants, Victoria's Secret Stores, LLC ("VSS") and Limited

Brands, Inc. ("L Brands"), as follows:

JURISDICTION AND PARTIES

1.     This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551

*et seq.,* Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, the Americans

with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Family and Medical Leave Act

("FMLA"), 29 U.S.C. §§ 2601 *et seq.,* and the Maine Family Medical Leave Requirements

("FMLR"), 26 M.R.S. §§ 844 *et seq.*

2.     Ms. Landry is a United States citizen residing in the Town of Old Orchard Beach,

County of York, State of Maine.

3.     VSS is a Delaware corporation, with headquarters in the City of Columbus, State of

Ohio.

4.      L Brands is a Delaware corporation, with headquarters in the City of Columbus, State of Ohio.

5.      VSS and L Brands both had 500 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

6.      VSS and L Brands had more than fifty employees within 75 miles of Ms. Landry's work location in the Maine Mall.

7.      VSS and L Brands had fifteen or more employees at Ms. Landry's work location.

8.      This Court has subject matter jurisdiction over Ms. Landry's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

9.      On or about October 3, 2018, Ms. Landry filed a timely Complaint/Charge of Discrimination against Defendants alleging unlawful sex discrimination and disability discrimination with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

10.     On or about July 1, 2019, the MHRC issued a Notice of Right to Sue with respect to Ms. Landry's state law claims.

11.     On or about July 8, 2019, the EEOC issued a Notice of Right to Sue with respect to Ms. Landry's federal law claims.

12.     Ms. Landry has exhausted her administrative remedies with respect to all claims set forth in this Complaint.

<u>JURY TRIAL REQUESTED</u>

13.     Ms. Landry requests a trial by jury for all claims and issues for which a jury is permitted.

FACTUAL ALLEGATIONS

14.     Ms. Landry began employment with Defendants on August 3, 2015 as a part time sales associate at the Victoria's Secret store in the Maine Mall.

15.     On about March 4, 2018, Ms. Landry was promoted to full time Merchandising Supervisor making $15.00 per hour.

16.     There were better benefits associated with full time status. Full time employees received more paid time off and extra paid holidays.

17.     A few weeks after Ms. Landry was promoted, all employees received a one dollar per hour raise. Ms. Landry's final rate of pay was $16.44 per hour.

18.     Ms. Landry reported to Store Manager Jenna McGroerty.

19.     Ms. Landry's second level supervisor was District Manager, Kelley Colby.

20.     When Ms. Landry was promoted the store was short staffed and Ms. McGroerty took a significant amount of time off for vacation.

21.     As a result, Ms. Landry never received proper training for her position.

22.     Ms. Landry was supposed to go to another store for two days of training by another Merchandising Supervisor but that never happened.

23.     Ms. McGroerty said she needed Ms. Landry to be trained for floor coverage and for the fitting room/bra measurements.

24.     When Ms. Landry was hired as a part time associate, she was given a one-page shrink prevention policy. She was told to treat a suspected shoplifter like a regular customer. Associates were told to follow the customer around in the store and to use a "code word" to alert other associates to keep an eye on the customer.

25.     Ms. Landry was never given any additional training on shrink prevention when she was promoted to Merchandising Supervisor.

26.     Ms. Landry never saw Defendants' Standard Operating Procedures - Shrink Prevention policy while she was employed.

27.     Defendants' new parental leave policy went into effect in March 2018.

28.     Under the March 2018 policy, full time employees were eligible for up to six weeks of leave at 60% pay.

29.     Full time employees could also save up PTO to use for additional leave or they could apply for short term disability.

30.     Under the March 2018 policy, pregnant women were eligible to begin parental leave on the date of delivery.

31.     The parental leave policy was modified again, effective in mid-June 2018.

32.     Under the June 2018 policy, full time employees could receive up to fourteen weeks off at full pay and they could choose to start their leave two weeks before due date. This was a significant benefit for employees who wanted to have children and not stress out about getting right back to work. Instead, they could stay home a little longer and bond with their newborn child.

33.     Ms. Landry was uncertain if she would be qualified for the new parental leave benefit because she was fairly new to the position as a full-time employee.

34.     Ms. Landry called Defendants' customer service hotline. She heard a message stating, "this call may be recorded."

35.     Ms. Landry asked if she was qualified for the new parental leave policy.

36.   The person she spoke to told her that she needed to have worked 1,250 hours in the previous year to be qualified.

37.   The person asked Ms. Landry for her due date.

38.   Ms. Landry told the person that her due date was September 30, 2018 but that she was going to be induced during the last week of September due to gestational diabetes.

39.   The person told Ms. Landry that by the time she delivered, she should just make 1,250 hours.

40.   Ms. Landry would have worked 1,250 or more hours in the past twelve months as of the time of her delivery.

41.   The person also told Ms. Landry that her estimated return to work date would be January 5, 2019.

42.   The person told Ms. Landry that she would eventually send out the parental leave paperwork so Ms. Landry could fill them out.

43.   Ms. Landry had been talking to the person for a while and could tell the person was annoyed by all her questions so Ms. Landry thanked her for the information and the person wished Ms. Landry to have a good day.

44.   Ms. Landry was very excited about the good news.

45.   In addition to being eligible for Defendants' parental leave, Ms. Landry was also entitled to protected leave under the FMLA and FMLR.

46.   In addition, Ms. Landry was entitled to leave for her delivery under Title VII and the MHRA.

47.     Ms. Landry's gestational diabetes was a disability because her body was not able to make and use all the insulin she needed, which is a substantial limitation of the functioning of her endocrine system.

48.     Defendants also regarded Ms. Landry as a person with a disability.

49.     Ms. Landry was entitled to leave for her delivery and recovery under the ADA and MHRA as a reasonable accommodation for her disability, gestational diabetes.

50.     Store Manager McGroerty and District Manager Colby both knew that Ms. Landry was pregnant and that she would be requiring leave.

51.     Ms. Landry told Ms. McGroerty about her pregnancy when Ms. Landry had an appointment to find out the sex of the baby. Ms. McGroerty asked Ms. Landry how the appointment went and told Ms. Landry that she was excited to find out Ms. Landry was finally having a little boy.

52.     A week before Ms. Landry was fired, Ms. Colby worked in the VSS store with Ms. Landry for an entire day and would have observed that Ms. Landry was pregnant.

53.     Ms. McGroerty and Ms. Colby also knew that Ms. Landry was pregnant because she asked them for time off during the Christmas/New Year holidays for the birth of her baby.

54.     Ms. Landry's request and need for time off for the birth of her baby was protected activity under the MHRA and Title VII.

55.     Ms. McGroerty knew that Ms. Landry had gestational diabetes because they talked about it. It is also likely that Ms. McGroerty observed Ms. Landry prick her finger to test her blood at work.

56.    In addition, Ms. Landry had conversations with Ms. McGroerty about her previous pregnancies. It is likely that Ms. McGroerty would have told Ms. Colby about Ms. Landry's gestational diabetes.

57.    On Wednesday, June 20, 2018, Ms. Landry was working the late shift at the store with Kyla Tibbetts and Grace Gracia.

58.    The store closed at 9 PM.

59.    At about 7:30 PM, two young women came into the store and started shopping.

60.    Three guards from Mall Security were standing outside the store.

61.    Ms. Tibbetts radioed Ms. Landry via her headset letting her know Mall Security wanted to speak to her at the front of the store.

62.    As Ms. Landry walked toward the front of the store, she stopped to speak to Ms. Tibbetts.

63.    Ms. Tibbetts told Ms. Landry that one of the security guards had witnessed one of the young women put a white bra in her H&M bag.

64.    Before Ms. Landry reached the place where the security guards were waiting, she approached the two young women.

65.    Ms. Landry did not accuse them of shoplifting and did not let on that a security guard suspected one of them of shoplifting.

66.    Ms. Landry greeted the shoppers as usual and asked if she could help them with anything.  They stated they were all set and would like to just look around. Ms. Landry let the shoppers know that if they needed any help to let her know. They replied, "Thank you."

67.    Ms. Landry walked over to the security guards at the front of the store.

68.     The guards asked Ms. Landry if she had just confronted the two females. Ms. Landry let them know that she had not.

69.     Ms. Landry explained that she did not understand what was going on and asked who saw what.

70.     Ms. Landry also told them that she did not personally see anything the young women were being accused of and that she would not be able to do anything about it even if one of the shoppers did put something in her bag.

71.     The guards looked at each other and discussed what to do.

72.     One of them said that he personally couldn't do anything either, because he wasn't the one who saw the young woman put a bra in her bag.

73.     The guard who witnessed the alleged theft stated, "Since I'm the one that saw her do it, I can at least go ask to look in her bag to see if it's there."

74.     Ms. Landry had clearly informed the security guards that she was not authorized to do anything to stop a suspected shoplifter. The guards were acting on their own when they insisted on checking the customer's bag.

75.     The guards told Ms. Landry to take them back to where the young women were. By then, about three to five minutes had gone by with none of them (security guards or Ms. Landry) watching the young women.

76.     It never occurred to Ms. Landry to question the security guards' authority. They wore uniforms and displayed badges and took charge of the situation.

77.     Ms. Landry told the guards that there would be a camera right where the young women were. One of the guards asked Ms. Landry to take him to view that camera. He asked three times before Ms. Landry cooperated.

78.     As Ms. Landry and the guard walked to the back where the store camera was located, Ms. Landry noticed that the young women had made their way to the fitting room entrance and one of them had a white bra in her hand. There was also a camera in that area. Ms. Landry pointed out where the young women had moved to, near the fitting rooms.

79.     Ms. Landry did not retrieve a shopper from a fitting room stall nor did the security guards.

80.     The female shoppers did not enter a fitting room stall; they never made it past the entrance of the fitting room area.

81.     Stalls are locked 24/7 due to privacy issues. Customers are not able to access stalls without help from a store employee.

82.     Letting men into the fitting room area did not violate any policy.

83.     Male customers are permitted to enter the fitting room area and stalls to try on merchandise.

84.     The guard who said he witnessed a theft asked if he could take a look in the shopper's bags.

85.     The guard told the young women that the bra that one of them was holding was the same one that he saw one of them put in the H&M bag when they were in the front area of the store.

86.     When the young women opened their bags there was nothing in there from Victoria's Secret.

87.     The guard that was beside Ms. Landry told her again that he needed to view VSS's security camera footage. Ms. Landry did not question his authority and took him out back.

88.    Ms. Landry had, in the past, observed Store Managers invite police officers into the back room to view the security tapes.

89.    Ms. Landry could not figure out how to replay the tape because she had not been trained on how to operate the cameras.

90.    Ms. Landry does not know what went on between the young women and the other two security guards while she was showing the third guard the security camera.

91.    The guards apparently allowed the young women to leave the store; Ms. Landry watched them leave from the back-camera screen.

92.    The third security guard and Ms. Landry returned to the front of the store to meet up with the other two guards.

93.    One of the guards told Ms. Landry that there was nothing from VSS in the bag and that the bra one of the young women was holding was the one the guard witnessed her earlier putting in her bag.

94.    The guard mentioned that it might be a misunderstanding and that the young women might not have known that the store had "shopper bags" for customers to use while shopping.

95.    The guards stated they were done with their investigation and told Ms. Landry to let them know when someone was available to help them view the security camera footage at a later time.

96.    About 15 minutes later, after the guards left, the same two female shoppers returned and asked if they could speak to the manager on duty.

97.    Ms. Landry identified herself as that person.

98.     The shoppers asked Ms. Landry what the earlier incident was all about. They wanted to know why security had checked their bags and why the guards didn't apologize.

99.     Ms. Landry was not sure how to respond to questions they should have posed to the security guards directly.

100.    Ms. Landry apologized to the shoppers on behalf of Defendants and Mall Security.

101.    Ms. Landry also stated that the security guards had told her what one of them had witnessed and that the guards had taken control of the situation.

102.    Ms. Landry apologized to both of the shoppers again for any embarrassment they had endured in the store. Ms. Landry made it clear that they were more than welcome to come back and continue to shop.

103.    The shoppers appeared to feel a bit better after Ms. Landry explained and apologized.

104.    Ms. Gracia and Ms. Landry told the young women that they were welcome to continue shopping in the store and if they needed any help to just let either of them know.

105.    The young women declined and stated that they were uncomfortable with how the security guards had treated them.

106.    The young women thanked Ms. Landry and Ms. Gracia, said that they would be back another time, and left the store.

107.    By then, it was time to get the store ready for closing.  Ms. Landry went out back and filled out the "Blue Day" paperwork which is an app the store uses to write observations during the day.

108.    It was late and Ms. Landry did not have time to write about the incident with the security guards.

109.    The following day, June 21, 2018, was Ms. Landry's day off.

110.    That day, a teacher contacted Ms. McGroerty to complain that the young women, exchange students from Russia, had been mistreated by Mall Security while in the VSS store.

111.    The teacher asked Ms. McGroerty to call Ms. Landry to find out what happened.

112.    Ms. McGroerty called Ms. Landry on her day off. One of her questions was, "Why was Mall Security even at the store?" Ms. Landry explained that the security guards were hanging out in front of the store and one claimed he witnessed the incident.

113.    After the initial call and conversation, Ms. McGroerty called Ms. Landry back a few more times.

114.    Ms. McGroerty told Ms. Landry that Mall Security was claiming that the only reason the guards were there was in response to a call about a suspicious shopper. Ms. Landry told Ms. McGroerty that wasn't true. Ms. McGroerty told Ms. Landry that the corporate office would check all phone records. Ms. McGroerty also told Ms. Landry that they looked at the camera and did not see either of the young women put a bra into the H&M bag.

115.    Upon information and belief, Ms. McGroerty contacted Ms. Colby to discuss the situation.

116.    Ms. McGroerty called Ms. Landry again and told her to call Ms. Colby.

117.    Ms. Landry did call Ms. Colby and had to leave a voice message.

118.    When Ms. Colby called Ms. Landry, they spoke for a few minutes then Ms. Colby said that she would call Ms. Landry first thing in the morning at work.

119.     On June 22, 2018, Ms. Colby called the store at around 8 AM and asked Ms. Landry to tell her exactly what happened on the evening of June 20. Ms. Landry did, and Ms. Colby told her that the investigation would continue.

120.     During a later phone call, Ms. Colby told Ms. Landry that a review of the phone records showed that Ms. Landry did not call Mall Security to report a suspicious shopper.

121.     Defendants caught Mall Security in a lie about getting a phone call from Ms. Landry or someone else at the VSS store asking for assistance with a suspicious shopper.

122.     Ms. Colby also questioned why Ms. Landry had not written about the incident in her "Blue Day" report. Ms. Landry explained that the incident happened at the very end of the night shift.

123.     Ms. Colby told Ms. Landry that she agreed that the security guards had bullied the situation.

124.     Ms. Colby asked Ms. Landry if at any point she felt that she may have been in the wrong, and Ms. Landry stated no. Ms. Landry told Ms. Colby that the security guards led her to believe that they were in charge and took matters into their own hands.

125.     Ms. Colby commented that anyone in Ms. Landry's situation that night would have reacted the same.

126.     Ms. Colby also said that she knew that Ms. Landry was still new to the management team and reassured her that if Ms. Landry ever needed to call management for any reason, question, or concern, that Ms. Landry should feel free to reach out to her or Ms. McGroerty to avoid problems like this in the future. Ms. Landry told Ms. Colby that she would do so, and that she was learning as time went on.

127.    Upon information and belief, L Brands' Asset Protection Manager Ryan Fay had a conference call with the head of Mall Security about the June 20, 2018 incident and told the head of Mall Security about Defendants' policies.

128.    Ms. Landry continued to work at the store as usual and attended daily morning meetings with Ms. McGroerty and the other associates.

129.    During one of the morning meetings held shortly after the June 20, 2018 incident, Ms. McGroerty asked the associates if they knew what to do if Mall Security asked to enter the store to investigate a suspected shoplifter. Not one of the associates knew what to do.

130.    At about 2 PM on June 27, 2018, Ms. McGroerty told Ms. Landry that the two young women would be coming into the store and getting Hallmark cards and L Brands gift cards for $300 each as an apology from Defendants.

131.    Ms. Landry was there when the young women came in and watched Ms. McGroerty hand them the cards and offer to help them shop. The young women stated they would use the cards at L Brands' other store, Pink. They said they were still uncomfortable about the incident.

132.    Ms. Landry assumed the whole situation was over.

133.    On Saturday, June 30, 2018, Ms. Landry was scheduled to start work at 6 AM.

134.    Ms. Tibbetts was on the schedule but did not show up for work.

135.    Ms. Landry reached out to Ms. Colby and Ms. McGroerty to let them know she was by herself in the store and asked what she should do. Ms. Landry was not sure if she was allowed to be in the store without another employee.

136.    Ms. McGroerty told Ms. Landry that after ten minutes, she could enter alone and that she should call the company and explain why she was there in the store alone.

14

137.    More than two hours went by while Ms. Landry was alone in the store with no help.

138.    Ms. McGroerty and Ms. Tibbetts finally showed up around 8:15 AM. (The store opened at 10 AM.)

139.    Ms. McGroerty took a call from Ms. Colby. After the call, Ms. McGroerty came out into the store and said she needed to speak with Ms. Landry.

140.    Ms. McGroerty looked at Ms. Landry and said it wasn't good. Ms. McGroerty was so upset that she was shaking.

141.    Ms. Landry told Ms. McGroerty she was scaring her.

142.    Ms. McGroerty said, "You should be," and told Ms. Landry that Ms. Colby was on the phone waiting to speak to her. Ms. Landry started to cry and asked if she was losing her job. Ms. McGroerty just gave her a look and said, "Kristy, I'm really sorry I was trying to prepare you before getting on the call with Kelley."

143.    Ms. Landry got on the phone call with Ms. Colby, who apologized for not being at the store in person. Ms. Colby explained that she needed to be at a store opening in Vermont. She also stated that Ms. McGroerty was in the room to be a witness to the call.

144.    The next thing Ms. Colby said was that the investigation was over and they had decided to terminate Ms. Landry.

145.    Ms. Colby asked Ms. Landry to hand her keys to Ms. McGroerty.

146.    Ms. Colby went on to say that Ms. Landry was being fired for violating store policy.

147.    Ms. Colby said that Mall Security are not the police, they did not have any rights in the store, nor did they have the right to look at the store cameras.

148.    Ms. Landry had previously told Ms. Colby and Ms. McGroerty that she had never been told about or trained on the rules with Mall Security and their authority. They had proof that Ms. Landry did not call Mall Security for assistance.

149.    Ms. Colby said that Ms. Landry was losing all of her benefits with the company including the 14 weeks of parental leave at full pay.

150.    Ms. Colby told Ms. Landry that she was not eligible for rehire at any L Brands store.

151.    Ms. Colby told Ms. Landry to sign her termination papers, pack her stuff, and leave the store.

152.    Ms. Colby told Ms. Landry that they had never had a similar situation in the past and they were using Ms. Landry as an example so that other employees would not make the same mistake.

153.    On July 29, 2018, one month after Ms. Landry was fired, there was a mandatory meeting at the Maine Mall VSS store to go over security policies and procedures. Staff was trained that Mall Security did not have any authority inside the store. Ms. Landry never had the benefits of this training.

154.    Defendants claim that Ms. Landry violated L Brands' Code of Conduct and L Brands' Standard Operating Procedure - Shrink Prevention policies.

155.    Ms. Landry was never given the Shrink Prevention policy prior to the June 20, 2018 incident.

156.    Ms. Landry's conduct did not violate the Shrink Prevention policy.

157.    The Shrink Prevention policy permits bag checks and sets forth a procedure for conducting such checks. Ms. Landry did not conduct a bag check.

158.    The Shrink Prevention policy says, don't accuse a customer of shoplifting. Ms. Landry did not accuse any customer of shoplifting.

159.    The Shrink Prevention policy says, don't detain or apprehend a shoplifter. Ms. Landry did not detain or apprehend anyone.

160.    The Shrink Prevention policy says, don't approach customers based on race, color, religion, gender, gender identity, national origin, citizenship, age, disability, sexual orientation, marital status, etc. Ms. Landry approached, greeted and offered assistance to the two female shoppers, as she did any other customer.

161.    The Shrink Prevention policy says, don't leave the store or chase a shoplifter to an apprehension. Ms. Landry did not leave the store or chase anyone.

162.    The Shrink Prevention policy says, don't use code words to describe the customer to other associates. Ms. Landry did not use code words to describe anyone.

163.    The Shrink Prevention policy says, don't contact mall security, the police, or another retailer about a suspicious individual(s) in your store. Ms. Landry did not contact mall security, the police, or another retailer. Mall Security contacted her.

164.    The Shrink Prevention policy says, don't notify the police, provide information or sign a complaint without notifying Asset Protection first. Ms. Landry did not notify the police, provide information or sign a complaint.

165.    The Shrink Prevention policy says, don't follow a customer around the store unless he/she has asked for assistance. Ms. Landry did not follow anyone around the store.

166.    The Shrink Prevention policy says, don't call for other associates to provide service using code words or terms. Ms. Landry did not call for other associates to provide service using code words or terms.

167.   The Shrink Prevention policy says, don't instruct mall security to make an apprehension, detain a customer or conduct a store walk through on any shoplifting issues. There was no apprehension and no one was detained in this case.

168.   To the extent that the facts in this case fit the definition of a "store walk through" with mall security, Mall Security acted with apparent authority and took charge of the situation and Ms. Landry lacked the training and experience to refuse the guards' directives.

169.   Ms. Landry had observed VSS Store Managers call Mall Security into the store and do walk throughs on many occasions prior to June 20, 2018.

170.   Ms. Landry also observed VSS Store Managers inviting the police into the back room to view security footage.

171.   Ms. Landry did not do anything that she had not observed Store Managers do.

172.   Defendants claim that there is a policy that says, if Mall Security responds to an incident at the store, associates are required to report the incident to a store manager, to asset protection, to the district manager, or to the emergency operations line, but Defendants did not produce a copy of this (alleged) policy during the Maine Human Rights Commission's investigation of Ms. Landry's Complaint/Charge of Discrimination.

173.   Ms. Landry never received proper training for her position as Merchandising Supervisor. She was supposed to go to another store for two days of training by another Merchandising Supervisor but that never happened. Ms. Landry did not do anything that she had been trained not to do.

174.   Ms. Colby told Ms. Landry that anyone in her situation on the night the security guards entered the store would have reacted the same way.

175.     Ms. Landry was a dedicated, conscientious and valuable employee with no prior discipline at the time she was fired.

176.     Ms. Landry had worked for Defendants for almost three years. She was Employee of the Month several times. She earned rewards for selling the most credit card applications.

177.     Ms. Landry stayed late and came to work early when she was needed. She made herself available for "on call" shifts so that the store was not short-handed.

178.     Ms. Landry's life revolved around her job and she saw herself growing with the company. She enjoyed what she did and her future looked bright.

179.     At most, Ms. Landry should have been given training or a warning that she had not been given a copy of or trained on the policies she supposedly violated.

180.     The holiday season is the busiest time of the year in retail. It is difficult enough to staff the store much less find coverage for a manager who is out on parental leave.

181.     Ms. Landry was terminated within thirty days of receiving her maternity leave paperwork from Defendants.

182.     Ms. Landry told her team members several times that she felt bad about going out on parental leave during the holiday season. Some of them said with sarcasm that they would be "fine," with no emotions.

183.     There is a scheduling "black out" during the holiday season. No one can request time off or use PTO. The only reasons a person can get time off during the holidays is for a reason required by law, e.g., military leave and FMLA.

184.     Defendants knew that Ms. Landry was eligible for and taking a leave of absence for her diabetes and pregnancy during the holiday season.

185.     When Ms. Landry was fired, Ms. Colby specifically advised Ms. Landry that she was not eligible for any benefits including maternity leave. This shows that Ms. Landry's gestational diabetes, pregnancy, and prospective leave were on Ms. Colby's mind when she participated in making the decision to fire Ms. Landry.

186.     Ms. Landry was the only pregnant worker with gestational diabetes at the Maine Mall VSS store at the time she was fired.

187.     Ms. Landry was going to be the first person at her store location to ever benefit from the parental leave policy.

188.     Ms. Landry was just one month shy of being eligible to take parental leave.

189.     When Ms. Landry was fired, there was only one full-time, non-supervisory associate who remained employed - Chrisanne Harris. Ms. Harris was a few years away from retirement and the company did not anticipate that she would not become pregnant and need parental leave.

190.     Another sales associate, Jona Jackson, was a full-time employee with benefits when she went on parental leave a few years ago. Shortly after Ms. Jackson returned to work and decided to leave or step down, the company announced that full-time sales positions would no longer be made available.

191.     Defendants' managers who made the decision to offer maternity leave benefits were different from the managers that opted to terminate Ms. Landry.

192.     Defendants' managers who were involved in terminating Ms. Landry were focused on the perceived adverse impact of maternity leave on their staffing needs rather than on the benefit of maternity leave to Ms. Landry.

193.     Both Defendants are liable for violating Ms. Landry's rights.

194.    VSS and L Brands were Ms. Landry's joint employers.

195.    VSS and L Brands were also an integrated enterprise.  Namely, they have common management, common ownership, an interrelationship of operations, and shared control of labor relations.

196.    L Brands aided and abetted VSS in violating Ms. Landry's rights under the MHRA, Title VII, ADA, FMLA, and FMLR.

197.    Ms. Landry's request and need for time off due to gestational diabetes was protected activity under the MHRA, ADA, FMLA and FMLR.

198.    Defendants terminated Plaintiff because of her sex (pregnancy) in violation of the MHRA and Title VII.

199.    Defendants terminated Plaintiff because of her disability and need for reasonable accommodation

200.    Defendants terminated Plaintiff because she requested and needed time off due to pregnancy and gestational diabetes.

201.    Defendants terminated Plaintiff in order to interfere with her right to take leave protected by the FMLA and FMLR.

202.    Defendants terminated Plaintiff in retaliation for her request for and need for leave protected by the FMLA and FMLR.

<u>COUNT I: MHRA – Sex (Pregnancy)</u>

203.    Paragraphs 1-202 are incorporated by reference.

204.    Defendants' conduct violates the MHRA's prohibition against sex (pregnancy) discrimination.

<u>COUNT II: MHRA – Disability</u>

205.    Paragraphs 1-204 are incorporated by reference.

206.    Defendants' conduct violates the MHRA's prohibition against disability

discrimination.

COUNT III: MHRA – Retaliation

207.    Paragraphs 1-206 are incorporated by reference.

208.    Defendants' conduct violates the MHRA's prohibition against retaliation.

COUNT IV: MHRA – Failure to Accommodate

209.    Paragraphs 1-208 are incorporated by reference.

210.    Defendants violated the MHRA by failing to provide Plaintiff with reasonable

accommodation.

COUNT V: Title VII – Sex (Pregnancy)

211.    Paragraphs 1-210 are incorporated by reference.

212.    Defendants' conduct violates Title VII's prohibition against sex (pregnancy)

        discrimination.

COUNT VI: Title VII – Retaliation

213.    Paragraphs 1-212 are incorporated by reference.

214.    Defendants' conduct violates Title VII's prohibition against retaliation.

COUNT VII: ADA

215.    Paragraphs 1-214 are incorporated by reference.

216.    Defendants' conduct violates the ADA's prohibition against disability

        discrimination.

COUNT VIII: ADA – Retaliation

217.    Paragraphs 1-216 are incorporated by reference.

218.    Defendants' conduct violates the ADA's prohibition against retaliation.

COUNT IX: ADA- Failure to Accommodate

219.    Paragraphs 1-218 are incorporated by reference.

220.    Defendants violated the ADA by failing to provide Plaintiff with reasonable accommodation.

COUNT X: FMLA

221.    Paragraphs 1-220 are incorporated by reference.

222.    Defendants violated Plaintiff's proscriptive and prescriptive rights under the FMLA.

COUNT IX: FMLR

223.    Paragraphs 1-222 are incorporated by reference.

224.    Defendants violated Plaintiff's proscriptive and prescriptive rights under the FMLR.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendants to be in violation of her rights;

B.    Enjoin Defendants, their agents, successors, employees, and those acting in concert with them from continuing to violate her rights;

C.    Order Defendants to reinstate Plaintiff or award front pay to Plaintiff;

D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' discrimination;

E.    Award equitable-relief for back pay, benefits and prejudgment interest;

F.    Award compensatory damages in an amount to be determined at trial;

G.    Award punitive damages in an amount to be determined at trial;

23

H.      Award liquidated damages in an amount to be determined at trial;

I.      Award nominal damages;

J.      Award attorney's fees, including legal expenses, and costs;

K.      Award prejudgment interest;

L.      Permanently enjoin Defendants from engaging in any employment practices which discriminate or retaliate on the basis of sex (pregnancy) or disability;

M.      Require Defendants to mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate discrimination in the future;

N.      Require that Defendants post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

O.      Require that Defendants train all management level employees on the protections afforded by the MHRA, Title VII, ADA, FMLA and FMLR;

P.      Require that Defendants place a document in Plaintiff's personnel file which explains that Defendants unlawfully terminated her because of sex (pregnancy), disability and retaliation; and

Q.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  September 13, 2019                    /s/ Chad T. Hansen
                                              Attorney for the Plaintiff

                                              MAINE EMPLOYEE RIGHTS GROUP
                                              92 Exchange Street 2nd floor
                                              Portland, Maine 04101
                                              Tel. (207) 874-0905
                                              Fax (207) 874-0343
                                              chad@employeerightslaw.attorney